# HOWARD

*v.*

# THE CHESAPEAKE & OHIO RAILWAY COMPANY.

PLEADING AND PRACTICE; SERVICE OF PROCESS; FOREIGN COR-
PORATIONS; PLEAS TO THE JURISDICTION; RECEIVERS;
AMENDMENT; STATUTE OF LIMITATIONS; HUSBAND AND
WIFE; EVIDENCE; RAILROADS; STATE COMITY; LEASE.

1. In a suit against a foreign corporation, a return of the marshal of
service on the defendant by service on C. H. C., agent, makes
out a *prima facie* case that the defendant was doing business
in the District as provided by R. S. D. C., Sec. 790, as well as
of the agency of the party so served.
2. Sec. 790, R. S. D. C., providing for the service of process on for-
eign corporations, was intended merely to afford a means of
bringing such corporations before the courts, and does not
limit the general jurisdiction of the courts of the District, or
prevent their jurisdiction from attaching where such a cor-
poration might appear and answer; *distinguishing* Ambler *v.*
Archer, 1 App. D. C. 94.
3. When a judgment by default is entered after pleas to the juris-
diction are stricken out, and the default on motion of the
defendant is set aside upon condition that the general issue
shall be pleaded, the acceptance of such condition constitutes
an abandonment of the pleas to the jurisdiction and any claim
of invalidity in the service of the summons, and estops the
defendant from afterwards questioning the correctness of the
court's ruling in striking out the pleas.
4. The decree of a court of another jurisdiction appointing receivers
of a corporation doing business in this District, does not
operate as a transfer of the property of the corporation situ-
ated here or a discontinuance of its resident office, and service
of process upon its local agent is valid when he continues in
charge of the office, although after the appointment of the
receiver he may be employed by the receiver.
5. The amendment of a declaration against a railroad company for
damages for personal injuries, so as to change the form of
action from assumpsit to tort, will not open the case to the
bar of the statute of limitations.
6. In the absence of proof as to the property rights of a married
woman in other States, it will be presumed by the courts of

D. C.]                    Statement of the Case.

this District that the rule of the common law or that in force here with respect of these rights, prevails in such other States.

7. A right of action to recover damages for personal injuries to a married woman is not in this District her separate statutory property, and can not be discharged by her separate release.

8. The general passenger agent of a railroad at the time a lost ticket was printed, may testify as to its contents, although he never saw it, from his recollection of the forms of tickets then in use, all of which had been prepared under his direction.

9. And such a witness in testifying to the contents of a certain excursion ticket, may refer to a single trip ticket to refresh his memory, where he testifies they were identical except as to one condition which related to the return coupon.

10. In the absence of a special contract to the contrary, a selling carrier's duty is completely discharged by a safe carriage to the end of its own line, where a connecting carrier may be ready to continue the transportation on the designated route.

11. Where two railroad companies enter into an arrangement by which practically a continuous system is formed under one management, and one of them sells a ticket under a condition limiting its liability to its own line, it is nevertheless responsible for the safe carriage of passengers over the other line ; and such condition must be limited in its operation to such other lines as have their own separate and independent management.

12. The fact that a railroad company had leased its lines to a foreign corporation will not exempt it from liability for an injury done in the operation of the railroad, where the State creating the lessor corporation had not given its consent to the making of the lease.

13. Under State comity, the lease by a railroad company of its lines within the State creating it, to a foreign corporation, will not be recognized by the latter State, where the charter of such foreign corporation prohibits it from operating or owning any railroad in the State in which it was incorporated.

No. 657.   Submitted April 13, 1897.   Decided November 1, 1897.

HEARING on an appeal by the plaintiffs from a judgment on a verdict directed by the court in an action to recover damages for personal injuries. *Reversed.*

The COURT in its opinion stated the case as follows:

William Howard and Laura P. Howard, his wife, began this suit in the Supreme Court of the District of Columbia,

on November 12, 1887, to recover damages for injuries sustained by the said Laura. The declaration alleged that defendant, from and after November 16, 1886, operated a line of railway as a common carrier for hire, between Louisville, Ky., and Washington, D. C.; that defendant, for the customary fare, then and there paid by said Laura P. Howard, contracted with her to safely carry her from Louisville to Washington; that she took passage on defendant's train at Louisville on November 18, 1886, for transportation as aforesaid; that defendant did not carry her safely, but, by reason of the negligence of its employees and the use of defective machinery, caused the car in which she rode to be derailed and thrown down an embankment at or near the station called Soldier, in the State of Kentucky, whereby she sustained permanent injury.

The summons to defendant was returned by the marshal of the District, with the indorsement: "Served the Chesapeake and Ohio Company by service on C. H. Chapin, agent, November 14, 1887."

December 6, 1887, defendant filed two pleas entitled "pleas to the jurisdiction," alleging (1) That it it is a foreign corporation, incorporated under the laws of the States of Virginia, and West Virginia, and subject to the jurisdiction of the courts of said States; and that on October 27, 1887, in the Circuit Court of Henrico County, Virginia, and on October 28, in the Circuit Court of Kanawha County, West Virginia, in proceedings in equity in said courts, respectively, of which they had jurisdiction, decrees were passed appointing William C. Wickham receiver of defendant, and delivering to him the possession of all of its property; that said receiver took possession of the property and has operated the defendant's road since said date; and that at the time of the service of summons the said Chapin was not the agent of defendant, nor a person conducting its business, but was the agent of said receiver. (2) That defendant, as such foreign corporation, is subject to the jurisdiction of the

courts of said States of Virginia and West Virginia, "and does not submit to the jurisdiction of this court, and was not, at the time of the alleged service of the process, November 14, 1887, doing business within the District of Columbia."

The said pleas had not been sworn to, and on January 27, 1890, the court sustained a motion to strike them out, and entered an interlocutory judgment of default with order of inquest by a jury.

On February 15, 1890, the court, on motion of defendant, vacated this order, " for the purpose of permitting the defendant to plead the general issue, and for no other purpose;" and ten days were granted therefor.   The plea was promptly filed.

On May 13, 1890, plaintiff filed an amended declaration, substantially the same as the original, but substituting for the allegation therein that defendant had contracted to carry plaintiff for the customary fare paid, &c., the following: "That said Laura P. Howard purchased from the agent of defendant at said city of Louisville a ticket entitling her to passage upon the said railway from the said city of Louisville to the said city of Washington, and the defendant thereby became bound to safely carry her," and so forth.

The defendant filed three pleas to the amended declaration, "not waiving its rights under former pleas:" First, not guilty; second, limitation of three years elapsing between date of injury and the filing of the amended declaration; and third, of accord and satisfaction for that, on November 24, 1886, the said Laura P. Howard, for the sum of $200, paid to her, had by writing under seal fully discharged defendant of all liability, etc.

The case came to trial on December 22, 1896, and judgment was rendered in favor of defendant upon a verdict directed to be returned by the court.   The evidence upon which the verdict was ordered to be returned for the defendant shows the following:

Plaintiff, Laura Howard, lived at Jeffersonville, Indiana,

and in 1886 was a clerk in the Department of Agriculture at Washington. She visited her home on leave in the fall of 1886, and started to return about November 16. Having seen an advertisement in the Louisville Courier-Journal of the schedule of the Chesapeake and Ohio Railway Company, between Louisville and Washington, she concluded to return that way. In the morning she purchased at the office of one Maeder, a "ticket broker or scalper," in Louisville, a coupon return ticket over the Chesapeake and Ohio road from Louisville to Washington, paying therefor $16.50. She procured a sleeping car berth and had her baggage checked through on said ticket. At 7 p. m., November 16, she entered a car in a train scheduled to leave at 7.30, and designated as "Chesapeake and Ohio train." Her ticket was taken up by the conductor and could not be produced. The car was derailed during the night near Soldier, in the State of Kentucky, and plaintiff sustained injury to her spine that has been pronounced incurable by an eminent specialist. While in New York, under his care, she was visited and examined by another surgeon, Dr. Clymer, at the instance of the defendant. A railway officer who saw the ticket on the day of its purchase said: "It was a Chesapeake and Ohio ticket. It was the return portion of a ticket sold in Washington, good for transportation between Louisville and Washington. The ticket purported to be issued by the Chesapeake and Ohio Railway Company, as appeared on its face."

Advertisements signed by H. W. Fuller, General Passenger Agent of defendant, and published by his authority, were read in evidence. The first, in Washington Daily Post, from July 1 to November 16, 1886, inclusive, showed that the Chesapeake and Ohio Railway leaves B. & P. depot daily for Newport News and other places in Virginia and the west—"solid trains with Pullman sleeper to Louisville." The second, in Courier-Journal, November 13, 1886, was headed "Chesapeake and Ohio Railway," and contained

among other things the following: "Only line running solid
trains between Louisville and Washington," with a sched-
ule showing arrivals in and departures from intermediate
cities.

There was testimony tending to show that the derailment
of the train was caused by the broken flange of a wheel on
one of the cars, and some also tending to show that the car
was not in good condition when it started.   The first surgeon
who treated plaintiff said that he was the surgeon of the
Chesapeake and Ohio road.   It was proved that Frank Trigg
was known in Washington in November, 1886, as local
agent of the Chesapeake and Ohio Railway Company.   He
was in the office of that company at the corner of Sixth
street and Pennsylvania avenue, with the sign over the door,
"Chesapeake and Ohio Railway Company." Trigg responded
to all inquiries concerning the business of the Chesapeake
and Ohio Railroad.

A witness (whose deposition, taken by plaintiff, was read
by defendant) testified that he sold Mrs. Howard the ticket—
"a regular issue of the Chesapeake and Ohio Railway." The
form of the ticket was 758c, Number 84, with two or three
coupons.   "The route was known to the public as Chesa-
peake and Ohio." He said further: "The names of those
roads were changed so often that I didn't keep track of them.
The western division terminated at Memphis and the Chesa-
peake and Ohio eastern division terminated at Washington,
although I think they ran over another road from Charlottes-
ville, into Washington, although we termed it C. & O.; and
that is what we term the C. & O. route." He further said
that he presumed the eastern division of the Newport News
and Mississippi Valley Company was in 1886 where it is now,
from Lexington to Huntington and Ashland, "but we call
that C. & O., and C. & O. tickets were good over that portion
of the road, as they are now."

On behalf of the defendant, it was shown that the bag-

gage car, smoker and ladies' coach of the derailed train had the name, "Newport News and Mississippi Valley Company," along their sides.

The decree of the Circuit Court of Henrico County, Va., rendered October 27, 1887, shows the appointment of Wickham as receiver of the Chesapeake and Ohio Railway, and the acceptance thereof with bond. The suit was entitled Collis P. Huntington, plaintiff, v. The Chesapeake and Ohio Railway Company and the Newport News and Mississippi Valley Company, defendants.

The following receipt was read by the defendant:

"Received, November 24th, 1886, of the Newport News & Mississippi Valley Company two hundred $\frac{0}{100}$ dollars, in full compromise, satisfaction and discharge of all claims or causes of action to me accrued against them, their lessors or predecessor companies, and particularly of all claims or causes of action arising out of personal injuries received by me while a passenger on the cars of the company near Soldier Station, Kentucky, which occurred on the night of 16th November, 1886. Witness my hand and seal.

"LAURA P. HOWARD.   [SEAL.]"

"Witness: C. W. P. BROCK."

Concerning this receipt and the circumstances under which it was executed Mrs. Howard testified:

She was extricated from the car by two men, who lifted her through the window and carried her down a ladder. She was afterwards taken on board the car of the superintendent of the railway, and she was there examined by Dr. Brock, who told her that he was the chief surgeon of the Chesapeake & Ohio Railway Company, and that he was on his annual tour of the railway at that time. She was transferred afterwards from the superintendent's car to another sleeping car and reached Washington City aforesaid early in the morning of November 18th. Witness was taken to 1806 11th street, in said city, where she remained confined to her bed. She was visited there a day or two after her

arrival by Mr. Frank Trigg, who was the local agent of the Chesapeake & Ohio Railway Company, who conferred with her as to her injuries. The next day Dr. Brock called and offered her $200, stating that it was for the purpose of "tiding her over the time she was kept from her employment." He presented a paper already prepared for her to sign and she signed it, supposing it to be a receipt for $200.

The testimony of Henry W. Fuller, General Passenger Agent, is given in full as it appears in the record:

After the appointment of the receiver, November 27th or 28th, 1887, I was the agent of the receiver of the Chesapeake and Ohio Railway. Mr. C. H. Chapin was in the service of the receiver as my direct representative in charge of the passenger business of the road. Mr. Frank Trigg, in November, 1886, was in the service of the Newport News and Mississippi Valley Company.

*Cross-examination*: During the month of November, 1887, I think this same advertisement (the advertisement in the Washington Post) was continued. I do not think that that advertisement was changed any. The place of business of the railroad company in this city was corner of 6th and Pennsylvania avenue. Mr. Chapin, when in his place of business, was in that office. My recollection is that the sign over the door was never changed. It was the Chesapeake and Ohio.

*Redirect*: Before I was in the employ of the Newport News and Mississippi Valley I was in the employ of the Chesapeake and Ohio; am familiar with the tickets from Louisville to Washington. All the tickets were issued under my general direction.

(Witness is handed a railroad ticket to refresh his recollection.)

This is a ticket from Washington to Louisville. It is not a ticket from Washington to Louisville and return. The form number indicates. It is a one-way ticket.

*Recross*: I did not do the detail work of issuing the ticket.

The forms of all the tickets are passed on by me. I do not handle the detail of writing up the form. I could not say that I had seen or read a return ticket from Washington to Louisville issued about November, 1886, but I can say that we issued round-trip tickets of a certain form. I think I can state from memory the substance of the contents of these tickets at that time. My memory relies on the general system on which my tickets are formed. Each particular ticket has a particular form and number. This ticket has a form and number and an individual number, as you will find at the head of the ticket on each coupon. 758*c* is the form number of this ticket. There would not be a return ticket of the form 758*c*; it would have an ex. (excursion) showing. In our system we issue a form of ticket, say, from Washington to Louisville, and that will be a 10*c*, for instance. We will issue another form of round-trip ticket over the same route, and it will be the same form, except that it will have the prefix ex., so that we have two forms, one straight and one round-trip. The round-trip would differ from the other only in having the reverse coupon and ex. I am able to testify to that from our general course of business. I read the tickets when they are prepared, but I could not locate them of any particular day or month.

(Thereupon witness was permitted to refresh his recollection from the ticket offered, and was then asked to testify as to what the return ticket would contain. To the asking of this question counsel for the plaintiffs objected, on the ground that the same called for incompetent matter; but the trial justice overruled the said objection and permitted the said witness to answer the same—which ruling the counsel for the plaintiffs then and there excepted, and the trial justice entered the same upon his minutes.)

The return coupons of the ticket issues at that time corresponding to this would read: Louisville to Lexington by the L. & N.; Lexington to Huntington by the Elizabeth-

town, Lexington and Big Sandy; Huntington to Charlottesville by the Chesapeake and Ohio or Newport News and Mississippi Valley, as the case may have been; Charlottesville to Washington by Virginia Midland.

Q. Will you read the contract at the head of the ticket and tell me whether any language corresponding to that, and, if so, what language, was on the return ticket?

(Same objection and exception noted.)

A. The return coupon of the contract would differ in some respects. It contains the main features, but contains a special round-trip contract. It would say that it was only good for return if presented in a certain number of days, but it would contain the same general features, the same language as at the head of this ticket.

(Same objection and exception noted.)

All the forms of tickets would contain that contract. The round-trip ticket would have a slight difference that the ticket would have to be used in a certain number of days. It reads: Washington to Louisville, Ky., via N. M., C. & O., E., L. & B. S., L. & N. The form is 758c. The return ticket would have the letters prefixed of e x, meaning excursion, form 758c. The next is Chesapeake & Ohio railway, good for one continuous first-class passage. Washington to Louisville, as per coupons attached. The other would read that way, subject to the following conditions, and the contract is as follows: "In selling this ticket for passage over other roads this company acts only as agent and assumes no responsibility beyond its own line. . . . None of the companies represented on this ticket will assume any liability on baggage except for wearing apparel, and then only for a sum not exceeding $100. No stop-off check will be issued on this ticket. Signed H. W. Fuller, general passenger and ticket agent." The next is a coupon as follows: Issued by Chesapeake and Ohio Railroad Co. on account of L. & N. railroad. One first-class passage, Lexington to Louisville. The check is not good if detached.

Washington to Louisville, Ky., via V. M., C. & O., E., L. &
B. S., L. & N.   The next coupon is as follows:

Issued by C. & O. railway on account of E., L. & B. S. R.
R., one first-class passage, Huntington to Lexington; this
theck is not good if detached.   Washington to Louisville,
Ky., via V. M., C. & O., E., L. & B. S., L. & N.   The next
coupon reads: C. & O. railway; one first-class passage,
Charlottesville to Huntington; this check is not good if de-
tached.   Washington to Louisville, Ky., via N. V. M., C. &
O., E., L. & B. S., L. & N.; on margin, 857c; that appears
on all coupons.   The next coupon is as follows:

Issued by C. & O. railway on account of Virginia Mid-
land railway, one first-class passage Washington to Charlottes-
ville; this ticket is not good if detached.   Washington to
Louisville, Ky., V. M., C. & O., E., L. & B. S. & L.   In
every case where it is issued on account of another railroad
the same words would appear on the return coupon.

Counsel for plaintiffs thereupon moved to strike out all
the testimony of the witness in respect of the contents of the
ticket in evidence as being incompetent; but the said
motion was overruled by the court; to which ruling the
counsel for the plaintiff then and there excepted, and the
trial justice entered the same upon his minutes; and the
said witness further testified as follows:

Did not post the announcement of the appointment of the
receiver in the office; they were simply sent to our agents,
and I don't know whether they were posted or not.

*Recross*: (Witness is shown combined maps and circu-
lars marked Exhibit 18, A. I. T. T., to deposition of Mr.
Wickham.)   Whatever there is of good, bad or indifferent
in that I am responsible for as general passenger agent of
the railroad.   I ceased to be employed by the Chesapeake
and Ohio road immediately on the formation of the New-
port News and Mississippi Valley Co. in July, 1886.   That
company was organized under a Connecticut corporation.
It is rather out of my knowledge.   I did not hold any of

the stock and never saw any of it.   The Newport News and
Mississippi Valley Co. acquired its equipment by purchase
from the various companies composing it—the Chesapeake
and Ohio, the Elizabethtown, Lexington and Big Sandy,
the Chesapeake and Ohio and Southwestern.    Upon the
dissolution of the Newport News and Mississippi Valley the
rolling stock was turned back to the original companies
that contributed it.

Q. I show you this circular which you say you are re-
sponsible for; on that page, under date November 21, 1886,
you will see Chesapeake and Ohio Railroad Co. running
solid through trains between Washington and Louisville.

A. That should have been Chesapeake and Ohio route.
The solid trains running between Washington and Louis-
ville was correct.   We ran one train a day at that time be-
tween Washington and Louisville composed of a baggage car,
two coaches, and a Pullman sleeper, and also one from
Louisville to Washington.   Just before the road went into
the hands of the receiver I was in the employ of the New-
port News and Mississippi Valley Company.   Mr. Chapin
was in the employ of the same company, and before that in
the employ of the Chesapeake and Ohio Company.   Mr.
Chapin was then also employed by the Chesapeake and
Ohio.   I commenced my employment with the Chesapeake
and Ohio Company fourteen years ago, in 1882 or 1883.
Some three or four years after that they opened an office in
Washington.   Mr. C. P. Huntington was president at that
time.   We located our office here, at 513 Pennsylvania
avenue, and have never moved from there, the corner of 6th
and Pennsylvania avenue.   They put the name Chesapeake
and Ohio Railway ticket office on the windows and over the
doors.   No changes have been made in the signs except in
colors and style; we try to improve them occasionally.   As
to the other advertisements (the newspapers), at the time we
were operated by the Newport News and Mississippi Valley
Company, for reasons I explained, purely advertising

reasons, we always continued to use Chesapeake and Ohio Railway—Chesapeake and Ohio Route. Could not say that from the time I commenced, in 1882, I ever advertised that I was the general passenger agent of the Newport News and Mississippi Valley Company; never took down the sign C. & O. railway passenger office; don't think the sign was ever changed. Mr. Chapin had been in my service for several years before 1887. As to the ticket about which I testified, from the course of business the return form would have these coupons on it, and each coupon would have at its head issued by the C. & O. R. R. on account of the particular road that appeared on the different coupons. I say that it would be issued under the name of the Chesapeake and Ohio, because they were some old forms we had on hand and wanted to use them up. We were running one through train at that time under certain traffic arrangements with certain lines on which we operated. We ran between here and Charlottesville over the Virginia Midland Railway, thence over Chesapeake and Ohio or Newport News and Mississippi Valley, Eastern division, to Lexington, and thence to Louisville, on L. & N. At the time I first became its employee the Chesapeake and Ohio ran from Richmond to Huntington. To-day it runs from Newport News to Norfolk, by ferry connection to Lexington, Ky., by wheelage contract to Washington. Just before I ceased to be employed by the Chesapeake and Ohio Company and went into the employ of the Newport News and Mississippi Valley Company we had this run from Huntington to Lexington. Our line at that time extended from Lexington to Newport News and Old Point Comfort. We had been operating the Elizabethtown, Lexington and Big Sandy road; it was simply turned over to us to operate. After the change to the Newport News and Mississippi Valley, Mr. Huntington was president all the time and I continued as general passenger agent. The Virginia Midland hauled our train from Washington to Charlottesville under an arrangement by which they would receive in payment what-

ever proportion of the business might be coming to them, and the same train was hauled from Charlottesville to Lexington under a similar agreement and from Lexington to Louisville under a contract with the Louisville and Nashville road.   We had no contracts for running cars to St. Louis, San Francisco, or elsewhere.   I don't think there was a contract in existence at that time between the Chesapeake and Ohio and the Virginia Midland, except an understanding that during the summer months certain cars would be called from the White Sulphur and through to Louisville.

(Advertisement in Washington Post is read to witness.)

At the time of these advertisements we were only sending out one train from the Baltimore and Potomac station. We had the authority of an arrangement with the Virginia Midland Company.   I could not give it in detail.   It was a special arrangement between us and the Virginia Midland.   We paid no consideration for it.   They took their proportion of the ticket business.   They did local business on it all the way to Charlottesville.   There was not a C. & O. employee on the train.   From Charlottesville to Lexington it was hauled over our own railway; that is a different sort of thing.   We called it at times the Chesapeake and Ohio; at other times it was the Newport News and Mississippi Valley Company.   The Virginia Midland got its proportion of the through-ticket price and we got ours. Our cars went from Lexington to Louisville under an arrangement with the Louisville and Nashville to take through cars.   We had contracts with other roads than the Virginia Midland and the Louisville and Nashville.   We have a contract with the Pennsylvania railroad to take our trains solid to New York City, and we go into their station in New York by an arrangement and contract with them. It is their train from Washington; we simply turn it over to them and they take what is in it.   We have these contracts only with companies over whose roads we send through trains.

When the receiver was appointed for the Chesapeake and Ohio Railroad Company the Newport News and Mississippi Valley Company at once turned over to said receiver the road-bed and all the rolling stock and equipment of the said Chesapeake and Ohio Railway Company. The said receiver was ultimately discharged and the said railroad company was again operated by its own officers.

Witness identified the following advertisement as being authorized by him, and the defendant's counsel offered it in evidence. Counsel for plaintiffs objected to its admission, but the court overruled the objection; to which ruling counsel for plaintiffs excepted, and the presiding judge then and there noted the said exception on his minutes:

Washington Post, November 23rd, 1886.

Chesapeake and Ohio route.

(Newport News and Mississippi Valley Company.)

Union Depot, Sixth and B streets.

11 a. m. for Newport News, Old Point Comfort, and Norfolk, 7 p. m.

9 a. m., for all stations on the Chesapeake and Ohio and points West. Sleeper from Clifton Forge daily except Sunday.

5.30 p. m., fast Western express, daily. Solid train, with Pullman sleeper, to Louisville. Pullman service to Cincinnati and St. Louis, Memphis and New Orleans.

Apply at C. & O. Railway Office, 513 Pennsylvania avenue, and B. & P. Station.

H. W. FULLER,

FRANK TRIGG,               *General Passenger Agent.*
*General N. E. Pass. Ag't.*

The history of the several corporations engaged from time to time in operating the "Chesapeake and Ohio route" is given in the testimony of Henry T. Wickham, Esq., a witness for the defendant, as follows:

Am a lawyer and director and general solicitor of the

Chesapeake and Ohio Railway Company; entered the service of the company in 1874; in January, 1886, was appointed general solicitor, and was made a director in 1888. The line of road constructed under the charter of the Chesapeake and Ohio Railway Company extends from Fortress Monroe, Virginia, to the west bank of the Big Sandy river. Soldier is a station on the line of the Elizabethtown, Lexington and Big Sandy Railroad Company, in Carter County, Kentucky, about 58 or 60 miles west of the Big Sandy river. The Elizabethtown, Lexington and Big Sandy Railroad Company is a corporation chartered under the laws of the State of Kentucky.

Am entirely familiar with the history of that road. The charter was amended in 1870 so as to give the company power to make contracts with other roads and to lease its line. It was further amended in 1871 to authorize the company to have a terminal in Louisville, and in 1872 an act was passed by the Kentucky Legislature authorizing the Elizabethtown, Lexington and Big Sandy Railroad Company and the Chesapeake and Ohio Railroad Company to bridge the Big Sandy river. (Copies of these acts placed in evidence.) Under these acts the line of the Elizabethtown, Lexington and Big Sandy Railroad Company was constructed from Lexington, Kentucky, to the west bank of the Big Sandy river, terminal facilities in Louisville, Kentucky, being provided by contract between the Elizabethtown, Lexington and Big Sandy Railroad Company, the Louisville and Nashville Railroad Company, and the Chesapeake and Ohio and Southwestern Railroad Company, dated December 28, 1881. (Copy of which contract is placed in evidence.) On November 12th, 1879, an agreement was made between the Chesapeake and Ohio Railway Company and the Elizabethtown, Lexington and Big Sandy Railroad Company the substance of which was that the Chesapeake and Ohio Railway Company, whose line then terminated at Huntington, West Virginia, should extend its line eight or nine miles

from Huntington to the west bank of the Big Sandy river, building a bridge across the Big Sandy river, and that the Elizabethtown, Lexington and Big Sandy Railroad Company, whose line then terminated at Mt. Sterling, in Montgomery County, Kentucky, should build and complete the line from Mt. Sterling to the Big Sandy river to a connection or point of junction with the Chesapeake and Ohio Railway. It was also agreed that the Elizabethtown, Lexington and Big Sandy River Railroad should be allowed the free use of the eight miles of road, including the bridge, into the depot of the Chesapeake and Ohio Railway Company, with terminal facilities at Huntington, for a term of five years from the date of the completion of the road between Huntington and the Big Sandy river. The road was completed between Huntington and the Big Sandy river early in 1882, according to my recollection. Am familiar with the history of the Mississippi Valley Company. Collis P. Huntington, a native of the State of Connecticut, was largely interested and the controlling spirit in a number of railroads, both west and east of the Mississippi. He had a plan for bringing into practically one management a line of road extending from the Atlantic to the Pacific. He consolidated his lines west of the Mississippi under the name of the Southern Pacific Company. In the progress of this plan he got a charter from the State of Connecticut under the name of the Southern Pacific Company, which name, as regards the lines east of the Mississippi river, was subsequently changed by the Connecticut Legislature to the Newport News and Mississippi Valley Company.

(Copy of which charter is by consent made part of the deposition.)

He organized his lines east of the Mississippi river, consisting of the Chesapeake and Ohio Railway Company, the Elizabethtown, Lexington and Big Sandy Railroad Company, and the Chesapeake and Ohio and Southwestern Railroad Company. The dates of the various acts constituting

the charter of the Newport News and Mississippi Valley Company are March 27, 1884, incorporating the Southern Pacific Company; March 10, 1885, changing the name to the Newport News and Mississippi Valley Company, and an amendatory act approved April 27, 1887. The Newport News and Mississippi Valley Company had organized and taken a number of leases from the foregoing companies, when a question arose as to the provisions of the original act, approved March 27, 1884, which provided that the Newport News and Mississippi Valley Company should not have the power to make joint stock with, own, hold, or operate any railroad in the State of Connecticut. The amendment of April 27, 1887, added these words: "unless such railroad shall be held, owned, or operated within said State in conformity with the provisions of the general law of the State." I was the general solicitor of the Newport News and Mississippi Valley Company.

(Witness hands the examiner copies of leases from the Elizabethtown, Lexington and Big Sandy Railroad Company and the Chesapeake and Ohio Company to the Newport News and Mississippi Valley Company, which by consent are made part of his deposition.)

(The lease from the Elizabethtown, Lexington and Big Sandy Railroad Company to the Newport News and Mississippi Valley Company is dated January 29, 1886, and provides in substance that the lessor leases to the lessee for a period of 250 years from the 1st day of February, 1886, the railroad extending from Lexington, Kentucky, to the west side of the Big Sandy river, together with its rights and privileges issuing out of the contracts with the Ashland Coal and Iron Company and with the Chesapeake and Ohio Company in respect of the railroad from the west bank of the Big Sandy river to Huntington, the lessee agreeing to pay $5,000 per annum rent.

The lease from the Chesapeake and Ohio to the Newport News and Mississippi Valley Company provides that the

Chesapeake and Ohio Company leases to the Newport News and Mississippi Valley Company for a period of 250 years from July 1, 1886, its railroads from Phœbus, Virginia, to Huntington, West Virginia, together with its rights and privileges arising out of its agreement with the Elizabethtown, Lexington and Big Sandy Railroad Company in respect of the railroad between Huntington and the west side of the Big Sandy river, for an annual rental of $5,000.

It is signed by Chesapeake and Ohio Railroad Company, C. P. Huntington, president; and Newport News and Mississippi Valley Company, C. P. Huntington, president.)

And thereupon the witness further testified as follows:

The Chesapeake and Ohio Railroad Company got into financial difficulties and was put into the hands of a receiver by the decrees of the Circuit Court of Henrico and the Circuit Court of the County of Kanawha on the 27th and 28th days of October, 1887, respectively, but from the date of the lease to the date of the decrees aforesaid, when the property was placed in the hands of a receiver by the court, the Newport News and Mississippi Valley Company operated the Chesapeake and Ohio Company, but after the appointment of the receiver the Newport News and Mississippi Valley Company had nothing whatever to do with the Chesapeake and Ohio Railway Company, but continued to operate the Elizabethtown, Lexington and Big Sandy Railroad Company under the lease.

My connection with the Newport News and Mississippi Valley Company terminated with the appointment of the receiver. I then became general solicitor for the receiver. The Newport News and Mississippi Valley Company continued to operate the Elizabethtown, Lexington and Big Sandy Company until 1892, I think.

(The various charters, acts and conveyances showing the limits of the Chesapeake and Ohio Railway Company are by consent placed in evidence.)

The Chesapeake and Ohio Company had nothing to do with the operation of the Elizabethtown, Lexington and Big Sandy Railway, while the Newport News and Mississippi Valley Company was operating it.

*Cross-examination*: Mr. Huntington controlled a number of disconnected roads both east and west of the Mississippi, which he desired to bring under one management, that of himself. He organized the lines west of the Mississippi under the charter of the Southern Pacific Company; those east of the Mississippi under the charter of the Newport News and Mississippi Valley Company. Mr. Huntington at the date of the leases was the president of the Chesapeake and Ohio Railroad Company and the president of the Newport News and Mississippi Valley Company. Mr. Reid was president of the Elizabethtown, Lexington and Big Sandy Company, but Mr. Huntington controlled both these roads in that he owned a very large portion of the stock and controlled most of that which he did not own. In one sense it was all under his control, but not in the sense of their being the same legal entities.

Thereupon the witness was shown a map and circular.

(This is in one of the forms of the ordinary "railway folder," and bears date November 21, 1886. On one side is a map of the United States showing railway lines and connections, and is entitled "Map of the Chesapeake and Ohio Route." A broad and heavily shaded line, designated as "Chesapeake and Ohio Railway" extends from Louisville, Kentucky, to Newport News and to Washington. On the reverse side, as folded, appear pictures and reading matter descriptive of the route and connections with accompanying time tables between Washington and Louisville and Cincinnati. Among the inscriptions thereon in large type appear: Time Table C. & O. Newport News and Mississippi Valley Co., W. C. Wickham, Second Vice President. H. W. Fuller, General Passenger Agent, Richmond, Virginia. Chesapeake and Ohio Route. Only line running solid trains between

Washington and Louisville. The solid train for Louisville and Cincinnati.)

Whereupon witness answered : This map and time-table was given to the public by the authority of H. W. Fuller, general passenger agent of the Newport News and Mississippi Valley Company, approved by John Muir, general traffic manager, and W. C. Wickham, second vice president; they had charge of the running of the road. It is dated Nov. 21st, 1886. I presume it is substantially what was in effect before that time, with the exception of changes in times of trains, connections, etc. The company gave out that publication because the trade-mark, as it were, of the system was the " C. & O. route." It was a well-known line and was being pushed and advertised for all it was worth. Through trains were run upon this route prior to the lease under an arrangement by which it was practically a continuous system. After the contract of November 12th, 1879, between the Chesapeake and Ohio Railway Company and the Elizabethtown, Lexington and Big Sandy Railroad Company, the former built the eight miles of road, including the bridge across the Big Sandy river, from Huntington to the west bank of the Big Sandy river, the latter completing its line to a junction or point of connection at the west bank of the Big Sandy, as I have said before, in the early part of 1882. The properties were then operated together by one general manager, Mr. C. W. Smith, under the verbal directions of Mr. C. P. Huntington, I have always understood, who was president of the Chesapeake and Ohio Company and controlled a majority of the stock of the Elizabethtown, Lexington and Big Sandy Railroad Company. Under the arrangement the officers of the Chesapeake and Ohio Company operated and maintained a line of railroad for and on account of the Elizabethtown, Lexington and Big Sandy Railroad Company from the west bank of the Big Sandy river to Lexington, and included in that also the eight

miles of track between the west bank of the Big Sandy
river and Huntington. They operated it, as I have said,
for and on account of the Elizabethtown, Lexington and
Big Sandy Railroad Company, keeping an account on the
books of the Chesapeake and Ohio Railroad Company of all
receipts of every character between Huntington and Lex-
ington, including also the Louisville connection, and charged
to the Elizabethtown, Lexington and Big Sandy Railway
Company all disbursements in that part of the line. The
arrangement continued in effect until the organization of
the Newport News and Mississippi Valley Company, when
its operating officers, who were General Wickham and Mr.
Fuller, operated the properties under the leases. The dura-
tion of this contract was five years from the date of the
completion of the road, which was in the early part of 1882,
which would have made the duration until 1887. The organ-
ization of the Newport News and Mississippi Valley Company
terminated the contract, I suppose by force of the arrange-
ment then made. It was terminated in the same manner
it was made, by direction of Mr. Huntington. Mr. Hunt-
ington directed Mr. Smith to operate the properties, as I have
indicated, and upon the formation of the Newport News and
Mississippi Valley Company and the execution of the leases
he directed the operation of the line to be had in accordance
with these leases. Mr. Huntington undoubtedly controlled
the whole enterprise, in that he held a controlling interest in
each company. He was president of the Chesapeake and
Ohio Railroad Company, the president of the Newport News
and Mississippi Valley Company, and Mr. Reid, who was
president of the Elizabethtown, Lexington and Big Sandy
Company, acted always in Mr. Huntington's interest. The
leases were prepared under the direction of Mr. Huntington
and expressed, as far as they went, his desires toward the
completion of the plan he entertained. This accident hap-
pened, I believed, on November 16th or morning of November
17th, 1886. When the lease went into effect it might be pos-

11 Ct. App.—22.

sible that there was on hand an old stock of Chesapeake and
Ohio tickets, but my impression is that this issue of tickets
must have been exhausted by the time of the accident and
been substituted by Newport News and Mississippi Valley
Company tickets.   At the time of the accident tickets were
issued in the name of the Newport News and Mississippi
Valley Company, as far as I know.   Prior to the organiza-
tion of the Newport News and Mississippi Valley Company
the tickets were issued in the name of the Chesapeake and
Ohio route, I think; am not sure whether they specified
Chesapeake and Ohio Railway Company or the Chesapeake
and Ohio route.   The line was operated as I have said.   It
was known to the public as the Chesapeake and Ohio route
or road.   If any of the Chesapeake and Ohio tickets were
outstanding at the time of the new arrangement, I am inclined
to think that the Newport News and Mississippi Valley Com-
pany would have had the right to refuse to honor such tickets.
If the company did honor such a ticket, then the possessor
of the ticket got ahead of the Newport News and Mississippi
Valley Company by that much unless an agent of the New-
port News and Mississippi Valley Company had sold it.   If
the passenger was rightfully on the train, the Newport News
and Mississippi Valley Company undoubtedly would have
been liable for a breach of its duty as a common carrier if
any accident happened by the negligence of that company.
Mrs. Howard's case was referred to me.   I was general solicitor
of the Newport News and Mississippi Valley Company at that
time.   Mr. Charles H. Tweed was at that time general counsel
of the Newport News and Mississippi Valley Company in
New York.   He was also Mr. Huntington's lawyer.

(Witness is shown the following letter:)

"Chesapeake and Ohio Railway Company), Mills building,
       seventh floor, room 1, Chas. H. Tweed, counsel.

                              "NEW YORK, March 7th, 1887.

"W. L. ARMSTRONG, 71 Broadway.

   "DEAR SIR: Referring to your letter of 25th ult. to Mr.

Huntington in regard to claim of Mrs. L. P. Howard, which you inform me has been placed in the hands of Mr. J. H. Judge, I should be very much obliged if you would ask Mr. Judge if he would have any objection to Dr. Meredith Clymer visiting Mrs. Howard, and if he has no objection thereto, whether he will send me such a note as will secure Dr. Clymer an opportunity of seeing her.

" Yours very truly,

" CHAS. H. TWEED."

I recognize the signature of Mr. Tweed.

(Letter read in evidence.)

I do not think the Chesapeake and Ohio Company made any offer of settlement with Mrs. Howard. I remember very distinctly that as general solicitor of the Newport News and Mississippi Valley Company I directed the chief surgeon of that company, Dr. Brock, to see her in Washington. He did see her and paid her $200 in settlement of her claim, which I vouched.

Soldier, where this accident occurred, is in the State of Kentucky and a station on the line of the Elizabethtown, Lexington and Big Sandy railroad about fifty miles west of the Big Sandy river. It is between Huntington and Lexington.

A number of instructions were asked by the plaintiffs, all of which were refused. Without giving these, it is sufficient to say that they covered the points, in application to the evidence, upon which the plaintiff relied. The court then ordered the jury to return a verdict for defendant.

*Mr. R. Ross Perry, Mr. James Francis Smith* and *Mr. R. Ross Perry, Jr.,* for the appellants:

1. The return, by an officer competent to serve a return and writ of summons, of the fact and mode of service, if in due form of law, is conclusive upon the parties to the record, in all proceedings, except in an action against the officer for a false return. 6 Thompson on Corp., Sec. 7507. The

proper course for the defendants to have pursued would have been to have moved to vacate the service of the writ in question. As the defendant did not do this, but pleaded, as has been seen, to the jurisdiction, the said pleas were to be strictly construed. There was no error in the order by which the said pleas to the jurisdiction were stricken out and judgment by default given against the defendant, and a jury of inquest ordered. In this condition of things the defendant's course was clear. If the court had no jurisdiction the judgment was a nullity. If the defendant had no property within the jurisdiction, it could not even have been put to inconvenience by the issuance of an execution. Instead, however, of relying upon the alleged want of jurisdiction, the defendant made a motion to have the judgment by default set aside. This was done, and in the same order leave was granted to the defendants to plead the general issue. Accordingly the defendant, under the said permission, formally pleaded the general issue. Upon this point *Railroad Co.* v. *Brown,* 17 Wall. 445, 448, 450, is conclusive.

2. That the mere appointment of a receiver does not *ipso facto* dissolve the corporation for which it is appointed is well-settled law. Am. & Eng. Encyc. of Law, 278; *Kincaid* v. *Dwinelle,* 59 N. Y. 548; *Pringle* v. *Woolworth,* 90 N. Y. 502; *Taylor* v. *Insurance Co.,* 14 Allen, 353; *Jones* v. *Bank,* 11 Colo. 464; *Hunt* v. *Insurance Co.,* 55 Me. 290; *Mosely* v. *Burrow,* 52 Tex. 396; *State* v. *Merchant,* 37 Ohio St. 251; *Davis* v. *Gray,* 16 Wall. 203; *Railroad* v. *Brown,* 17 Wall. 445; *Railroad Co.* v. *Jones,* 155 U. S. 333.

"Receivers appointed by one jurisdiction are not entitled, as of right, to recognition in other jurisdictions; and courts of equity can not acquire extra-territorial jurisdiction over property by appointing receivers." 20 Am. & Eng. Encyc. of Law, 65, 66; *Atkins* v. *Railroad Co.,* 29 Fed. R. 173; *Booth* v. *Clark,* 17 How. 335.

3. The conclusions as to the liability of a carrier selling a through ticket over several connecting roads to a point

beyond its own lines are by no means harmonious. The English doctrine, and that of some of the States, is that the carrier is liable for the performance of the contract of transportation through to the point of destination, and must therefore respond in damages in the event of the injury or delay of a passenger before reaching that point. 25 Am. and Eng. Encyc. of Law, 1085, 1086, and cases under note 2. The majority of our courts, however, have held, in accordance with what is called the American rule, that the mere acceptance of goods directed to a point off the carrier's line is not a sufficient basis for the implication of a contract for extra-terminal liability, and that, in the absence of an express contract, or of more significant facts or specifications than the fact of acceptance as the basis of an implied contract, the initial carrier is discharged by carrying safely to the end of its line and there delivering to the next carrier. 4 Elliott on Railroads, 2227, and cases under note 2; 25 Am. and Eng. Encyc. of Law, 1086, and authorities under note 3.

The contract of through carriage may, however, be implied. As to what will, under the American rule, constitute a sufficient basis for the implication of a contract nothing very definite can be said. A contract will not necessarily be implied even from the shipper's payment or guarantee to the initial carrier of through freight. An undertaking, however, in the receipt for the goods, to forward them beyond its line, is generally held to bind the initial carrier for the entire carriage. And the fact that the initial carrier named the through rate and collected the entire charge has been held. in some jurisdictions, to be a circumstance strongly tending to show a contract for through transportation by it, or such a connection in business as to make the first carrier liable over the entire route. As illustrations of circumstances which will constitute such a contract, the following cases are referred to: *Quinby* v. *Vanderbilt*, 17 N. Y. 306; *Railway Co.* v. *Tisdale*, 74 Tex. 8; *Beggs* v. *Narragansett Co.*, 5 Daly,

394; *Candee* v. *Railroad Co.*, 21 Wis. 582; *Manufacturing Co.* v. *Railroad Co.*, 104 Mass. 122; *Woodword* v. *Railroad Co.*, 1 Biss. 403; *Page* v. *Railroad Co.*, 64 N. W. Rep. 137; *Lock Co.* v. *Railroad Co.*, 48 N. H. 339; *Railroad Co.* v. *Pratt*, 22 Wall. 123.

The passage ticket, in the ordinary form, is merely a voucher, token, or receipt, adopted for convenience, to show that the passenger has paid his fare from one place to another, and does not constitute the contract of carriage, although it may and often does have upon it some condition or limitation which enters into and forms a part of the contract. Accordingly, it is admissible to prove by parol evidence the terms of the contract in fact entered into between the carrier and the passenger. 25 Am. & Eng. Encyc. of Law, 1075, and authorities cited under note 1. It necessarily follows that parol evidence may also be given of all the circumstances under which the ticket was purchased. What the real contract was will be shown not by the ticket alone, but by the ticket connected with the advertisements to the public authorized and made by the railroad company on the faith of which the public purchase tickets.

While the liability of a common carrier of goods is that of an insurer, and therefore greater than that of a common carrier of passengers, yet, when the question is concerning the contract of carriage, there is no difference. *Myrick* v. *Railway Co.*, 107 U. S. 102, 107. See also in this connection 2 L. R. A. 84, 85, 252, and notes. With respect to the policy of the law, in considering provisions inserted by common carriers in receipts, tickets, notices, and similar instruments, see *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 318, 329.

As conclusions from authorities quoted, it may be admitted that where two or more railroads form an agreement in consequence of which they run through trains from point to point, the mere fact that they do run such through trains will not make one liable for the negligence of the other, where there is no partnership or agreement tantamount thereto existing between the said companies. That is, how-

ever, not the case which is involved here. Upon any theory of this case, the learned trial justice should have submitted to the jury the question as to what contract was in fact made or implied under all the circumstances of the case by the purchase of the railroad ticket in question here. *Myrick* v. *Railroad Co.*, 107 U. S. 102, 107.

4. Inasmuch as the plaintiff bought a Chesapeake and Ohio railroad ticket, under the circumstances shown by the evidence in this case—to wit, the advertisements by the defendant in the public press, the circulation by it of the railroad map and circular set out in the record, and the "pushing of the said Chesapeake and Ohio railroad route for all it was worth"—the defendant company is estopped from asserting that it was not in point of fact itself operating a through line from Louisville to Washington and return in November, 1886. *Railroad Co.* v. *Brown.* 17 Wall. 445, 451.

The most that can be said by the defendant, in opposition to the plaintiff's claim upon this theory of the case, is that a jury might have inferred, from the testimony in the case, that the ticket actually bought by Mrs. Howard contained statements to the effect that the defendant was not a through carrier, and that it stipulated against liability for any negligence but its own. Certainly, however, even on this hypothesis, it was the province of the jury to determine whether or not the purchaser of a ticket had a right to rely on the general conduct and advertisements of the defendant, rather than upon a printed form of statement contained in a ticket. So far as the stipulation against liability for negligence is concerned, it may very well be satisfied by interpreting it as exempting the defendant from liability by reason of defects in the road-beds of the subordinate railroads, if, indeed, it could operate to that extent. If the position of the defendant was that of a through carrier, then certainly any stipulation in the ticket against its own negligence, in providing improper cars or improperly running its own train over the roads of subordinate and con-

necting carriers, would be invalid. This is well-settled law. *Hart* v. *Railroad Co.*, 112 U. S. 331, 338. Besides, the injury resulted from the defendant's own negligence, the accident being caused by a broken flange on a wheel of a car of the train. The stipulation was therefore immaterial, because it was a stipulation against liability for the negligence of others. It can not escape liability for its negligence in furnishing such car, by the fact that the car was running over subordinate and connecting roads. Upon this point counsel refer to the statement contained in 4 Elliott on Railroads, 2450, the latest text-book on the subject, and to the following authorities as illustrating the statement of the text: *Railroad Co.* v. *Tisdale*, 74 Texas, 8 ; *Chollette* v. *Railroad Co.*, 26 Neb. 159 ; *Washington* v. *Railroad Co.* 101 N. C. 239 ; *Railway Co.* v. *Groves*, 44 Pac. R. 628 ; *Howe* v. *Gibson*, 3 Tex. Civ. App. 263 ; *Webb* v. *Railroad Co.*, 57 Maine, 117 ; *Railroad Co.* v. *Barron*, 5 Wall. 90, 104 ; *Block* v. *Railroad Co.*, 139 Mass. 308 ; *Tillett* v. *Railroad Co.*, 24 S. E. Rep. 111 ; *Murray* v. *Railroad Co.*, 66 Conn. 512 ; *Railroad Co.* v. *Ross*, 27 S. W. Rep. 728 ; *Railroad Co.* v. *Bond*, 20 S. W. Rep. 930 ; *Martin* v. *Railroad Co.*, 26 S. W. Rep. 801 ; *Barkington* v. *Railroad*, 19 S. E. Rep. 915 ; *Railroad Co.* v. *Garrison*, 30 Fla. 557.

*Mr. W. H. Payne, Mr. Leigh Robinson* and *Mr. W. Willoughby* for the appellee :

1. The sale of a coupon ticket entitling the purchaser to passage over lines connecting with the carrier selling the ticket, in the absence of express contract otherwise, creates no different duty and liability from that which would accrue had the passenger purchased a ticket at the office of each company constituting the through line. *Railroad Co.* v. *Schwarzenberger*, 45 Pa. St. 208 ; *Hartan* v. *Railroad Co.*, 114 Mass. 47 ; *Railroad Co.* v. *Connell*, 112 Ill. 295.

The law relating to bills of lading has no application here, for the effect of a bill of lading is not matter of impli-

cation, but an agreement in writing delivered by one party and accepted by the other, so as to be a binding contract, which defines their rights and liabilities. Yet even in the case of freight, the general rule is that a carrier is not liable beyond its own line, unless by contract. The fact alone that it has received goods marked for a place beyond its own terminus does not import an agreement to transport to the destination named as common carrier, and this because in the absence of an express contract it is not a common carrier beyond its own line, and the law does not compel it to act as a common carrier over other lines not within its control. *Hunter* v. *Railroad*, 76 Tex. 195; *Sumner* v. *Walker*, 30 Fed. Rep. 261; *McConnell* v. *Railroad*, 86 Va. 248.

It is proper, however, to bear in mind the distinction in the law of liability governing the transportation of freight and that governing the transportation of passengers. Authorities pertinent to the former do not necessarily apply to the latter. The distinction is clearly stated in 2 Redfield on Railways, Sec. 201. See also Hutchinson on Carriers, Sec. 578. This distinction eliminates from consideration such authorities as relate to freight or baggage. As to passengers the law is that a through ticket over several distinct lines of passenger transportation issued in the form of three tickets on one piece of paper and recognized by the proprietors of each line is to be regarded as a distinct ticket for each line. The rights of a passenger purchasing such a ticket and the liabilities of the proprietors of the several lines recognizing its validity are the same as if the purchase had been made at the ticket office of the respective lines. *Knight* v. *Railroad Co.*, 56 Me. 234; *Milnor* v. *Railroad Co.*, 53 N. Y. 369. See also *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 324; *Myrick* v. *Railroad Co.*, 107 U. S. 107; *Mosher* v. *Railroad Co.*, 127 U. S. 390; 2 Wood's Railway Law, Sec. 359; 25 Am. & Eng. Encyc. L. 1086.

2. The express contract in this case is not modified by the advertisements. *Hood* v. *Railroad Co.*, 22 Conn. 10–12.

Nor by the map and the ownership of stock. *Railroad Co.* v. *Jones,* 155 U. S. 333; *Pullman Car Co.* v. *Mo. Pacific Co.,* 115 U. S. 594.

3. The lease of a railroad, when authorized by law, renders the lessee exclusively liable for all injuries occurring on the line of the leased road subsequent to the lease. 2 Elliott on Railroads, Sec. 469; Hutchinson on Carriers, Sec. 515*b*; Pierce on Railroads, 283; *Day* v. *Railroad Co.,* 107 N. Y. 140; *Railroad Co.* v. *Ely,* 65 Pa. St. 205; *Mahoney* v. *Railroad Co.,* 63 Me. 68; *Railroad Co.* v. *Washington,* 86 Va. 635. The consolidation of two or more railroad companies, under authority of statute, works a dissolution of the old corporations and the creation of a new corporation to take their place, subject to the existing obligations of the old companies. *Pullman Car Co.* v. *Mo. Pacific Co.,* 115 U. S. 587.

That one railroad company can not, in the absence of statutory authority, lease its road to another so as to absolve itself from its obligations to the public, is established by *Thomas* v. *Railroad Co.,* 101 U. S. 84, and *Railroad Co.* v. *Winans,* 17 How. 30. But the clear implication from these cases is that, with such authority, it may be done.

4. The nonliability of the defendant company after July 1, 1886, for an injury occurring on the line of road, which prior to said date had been incontestably its own, had been adjudicated in the Supreme Court of the District of Columbia. *Dye* v. *C. & O. R. Co.,* at Law, No. 27,694. While, therefore, the doctrine of *res judicata* does not apply to the case because the plaintiff is different, the principle of *stare decisis* does.

5. The court below was without jurisdiction of the cause, for the reason that the defendant was a foreign corporation, and before the institution of the suit, the courts of Virginia and West Virginia, having jurisdiction so to do, had placed its property in the hands of a receiver; and the person upon whom the alleged service of process was made was the agent of the receiver and not of the defendant.

In this District it is only "in actions against foreign cor-

porations doing business in the District" that there is any jurisdiction to try cases against them, which, in the instance mentioned, is obtained "by service on the agent of such corporation or person conducting its business." No such agent was served, and, what is more important, there was none to be served. The defendant company was not conducting business anywhere. The premises from which jurisdiction is derived were wholly non-extant. The court was not competent to try the case at all. Thompson on Corp., Sec. 7503 ; *Amy* v. *Watertown*, 130 U. S. 302 ; *Ambler* v. *Archer*, 1 App. D. C. 106; *Railroad Co.* v. *Telegraph Co.*, 112 U. S. 310 ; *Lathrop* v. *Railroad Co.*, 1 MacA. 238. The objection that the court below had no jurisdiction may be raised for the first time in the appellate court. *Cerro Gordo County* v. *Wright County*, 59 Iowa, 485; *Brondberg* v. *Babbett*, 14 Neb. 517 ; *Nazro* v. *Cragin*, 3 Dill. 475.

6. A receiver appointed by a State court could only be sued by leave of the court appointing him. The party upon whom process was served in the present case was in point of fact in the service of the receiver appointed by the decrees referred to—a party exempt from suit in this jurisdiction, without leave from the courts under whose decree he was acting. *Railroad Co.* v. *Jones*, 155 U. S. 350; *Barton* v. *Barbour*, 104 U. S. 128–131; *Porter* v. *Sabin*, 149 U. S. 479 ; 5 Thomp. Corp., Sec. 7128 ; High on Receivers, Sec. 254; *Keen* v. *Breckenridge, Receiver*, 96 Ind. 69 ; *Cherry* v. *Railroad Co.*, 59 Ga. 446; *Metz* v. *Railroad Co.*, 58 N. Y. 66 ; *Railroad Co.* v. *Hoechner*, 67 Fed. Rep. 459.

A receiver can neither sue nor be sued without leave of the court appointing him. *Pike Co.* v. *State*, 34 N. E. 440; *Martin* v. *Atkinson*, 2 Idaho, 590 ; *Melendy* v. *Barbour*, 78 Va. 544; *Jordan* v. *Wells*, 3 Wood's C. C. 527; High on Receivers, Sec. 254; 3 Wood's Rwy. Law, 1656.

The receiver is not subject to the process of any other court than the one which appoints him. 2 Redfield on Railways, p. 424. "Where the property of a railroad com-

pany is in the hands of a receiver and its road operated by him, service of process upon the agent of the receiver will give no jurisdiction over the company." *Heath* v. *Railroad Co.*, 83 Mo. 618 ; 20 Am. & Eng. Encyc. 355.

7. Unless disabled by her coverture from so doing, Mrs. Howard has signed and sealed a full satisfaction and discharge of all her claims on account of the accident at Soldier, by whatever company it may have been caused. *Stockton* v. *Frey*, 4 Gill, 424; *Hager* v. *Thompson*, 1 Black, 80; *U. S.* v. *Childs*, 12 Wall. 245; *Hennessey* v. *Bacon*, 137 U. S. 85; *Clark* v. *Abbott*, 53 Minn. 90; *Bull* v. *Bull*, 43 Conn. 455; *Keyser* v. *Hite*, 133 U. S. 149.

8. The record shows another fatal error, which would necessarily cause an arrest of judgment upon motion. An amendment to the original declaration was made, changing it from an action upon contract to an action in tort. To the amended declaration was interposed the plea of the statute of limitations. An injured passenger may sue, in assumpsit upon the contract or in case upon the breach of the duty raised by the law. Patterson on Accident Law, 390, and authorities cited ; *Railroad Co.* v. *Derby*, 14 How. 485. The statute of limitations will operate against an amended declaration which for the first time sets up a sufficient cause of action or sets up a new cause of action. *Moses* v. *Taylor*, 6 Mackey, 255 ; *Johnson* v. *District of Columbia*, 1 Mackey, 427; *Union Pac. Co.* v. *Weyler*, 158 U. S. 285.

In the following cases the declarations were almost identical with the original declaration in the case at bar, and they were held to be suits upon contract. *Railroad Co.* v. *Peoples*, 31 Ohio St. 537; *Bank* v. *Brown*, 3 Wend. 158. In the following cases the declarations were almost identical with the amended declaration, and they were held to be declarations in tort. *Ansell* v. *Waterhouse*, 6 M. & S. 385 ; *Bethlehem* v. *Wood*, 7 E. C. L. 602 ; *Bozzi* v. *Shipton*, 8 Ad. & El. 963. The amended declaration was therefore open to the bar of the statute of limitations. *Crofford* v. *Cothran,*

2 Sneed (Tenn.), 492; *Palmer* v. *Express Co.*, 52 Ga. 240; *Weeks* v. *Railroad Co.*, 61 Cal. 149; Wood on Limitations, 623.

Mr. Justice SHEPARD delivered the opinion of the Court:

The judgment appealed from can not be sustained upon the ground that the court below had no jurisdiction over the defendant, because it was a foreign corporation. The marshal's return of service upon C. H. Chapin, agent of the defendant in the District of Columbia, follows the statute providing for the service of process upon foreign corporations (R. S. D. C., Sec. 790), and makes a *prima facie* case of "doing business in the District" as well as of the agency of the party so served. The defendant's pleas raised the only points in respect of the jurisdiction of the court that could operate in a case like this, namely, that the court had not acquired jurisdiction of the foreign corporation because it was not doing business in the District of Columbia at the time of the service of the writ; and the party served as its agent therein was not such an agent as to give jurisdiction through that service. Having jurisdiction of the subject-matter of the suit, the court could unquestionably render a binding judgment against the defendant, though a foreign corporation, upon service had in compliance with the provisions of the statute and founded on the existence of the conditions therein prescribed, or upon its general appearance, by competent authority, to defend the action. *Goldey* v. *Morning News*, 156 U. S. 518.

Section 790, *supra*, was intended merely to remedy an existing mischief by providing a simple and effectual way through which a foreign corporation doing business in the District of Columbia might be brought "before the court" and compelled to answer. It does not undertake to limit the general jurisdiction of the courts of the District, and can not be construed as preventing their jurisdiction from attaching in any case where a foreign corporation might,

like a natural person resident elsewhere, appear by competent authority and answer the cause of action.

The remarks made in *Ambler* v. *Archer*, 1 App. D. C. 94, 106, in respect of the jurisdiction of causes of action against foreign corporations must be taken in application to the facts of that case.   As stated in the opinion; that case "involved the question of the liability of a foreign corporation to be sued and called to account in the courts of this District for and in respect of all their corporate transactions occurring in other jurisdictions." Id., p. 99.   It has been generally held, and for reasons that are obvious, that no court will take jurisdiction to exercise visitatorial power over a foreign corporation, or to regulate its internal affairs. Clark on Corp. 639 ; Taylor Corp., Sec. 392.

The defendant had the right to appear specially, as it did in the first instance, and controvert the jurisdiction ; and none of its rights were thereby waived.   *Goldey* v. *Morning News,* 156 U. S. 518, 525.   Consequently, when its pleas were stricken out and judgment by default rendered, it could have appealed and tested the soundness of that ruling. But instead of adopting that course, it moved the court to set aside the default, and that motion was granted upon condition that it should plead the general issue.   The acceptance of the condition worked an abandonment of the pleas attacking the jurisdiction and the validity of the service of the writ, and had the court erred in striking them out, the defendant would be estopped to question the soundness of the ruling.   *Railroad Co.* v. *Brown,* 17 Wall. 445, 450.

Moreover, conceding the view of the operation of the statute aforesaid contended for by the appellee, the jurisdiction of the court was, nevertheless, complete.   Defendant had for years maintained an office in the District, where, represented by a resident agent, it was engaged in business. Disregarding the lease made by the defendant to the Newport News and Mississippi Valley Company, which will be

discussed later, that office and agency remained unchanged at the time of the appointment of the receiver by the courts of Virginia and West Virginia.   The decrees of those courts could not operate a transfer of the property of the defendant in the District of Columbia, and the receiver appointed by them had no authority that must be respected here. *Booth* v. *Clark*, 17 How. 322; see also *Brigham* v. *Ludington*, 12 Blatch. 237, 242; *Day* v. *Postal Tel. Co.*, 66 Md. 354, 360; *T. & P. R. Co.* v. *Gay*, 86 Tex. 571, 597; *Filkins* v. *Nunnemacher*, 81 Wis. 91; *Farmers' and Merchants' Ins. Co.* v. *Needles*, 52 Mo. 17.

What has been said above must be confined to the point actually ruled, which is that the decree of the Virginia court had no effect as such within the District of Columbia, and could not itself operate a transfer of the property of the defendant situated therein.   There may probably be cases in which the courts of the District would, upon application and for good cause, recognize the receiver appointed by the court of a State and permit him to become a party to litigation affecting the estate or fund or interests that might be under his management; but that question will not now be decided.

Notwithstanding, then, the appointment of the receiver, the defendant remained in existence as a corporation, not only here, but in the State of its creation also; and although it may have admitted the Virginia receiver into the occupation of its office in the District, it does not follow necessarily that it abandoned its property, ceased its corporate business entirely, discharged its former agent and left the District.   The mere employment of the defendant's general agent by the receiver did not of itself operate his discharge from its representation.   There is nothing irreconcilable in his service of both the defendant and the receiver; and there was nothing to prevent them from co-operating, if they saw proper, in the management of the business.   *R. Co.* v. *Brown*, 17 Wall. 445, 450; *P. R. Co.* v. *Jones*, 155 U. S. 333, 350.

2. In respect of the plea of limitation, we are of the opin-

ion that the amended declaration, though filed more than three years after the accrual of the cause of action, did not open the case to that bar. The possession of a valid ticket over defendant's lines of railway entitled Laura P. Howard, as holder thereof, no matter from whom purchased, to all the rights of a passenger and charged the defendant with all the ordinary duties of a common carrier. *Sleeper* v. *Pa. R. Co.*, 100 Pa. St. 259. For the breach of the contract, or the failure of the duty assumed thereunder, the plaintiffs could declare in the form of *assumpsit* or in tort. We do not think it necessary to follow counsel in their critical examination of the precise nature of the form of the action as disclosed by the terms of the original and amended declarations, both of which are fairly set out in the statement of the case. It is sufficient to say that the original is in *assumpsit*, and that the amendment seems not to depart substantially from it. The rule in respect of amendments that prevails in our practice is both liberal and just. *Magruder* v. *Belt*, 7 App. D. C. 303, 312; *Morris* v. *Wheat, ante*, p. 201. And when an amendment shall have been made, the question whether the action has been thereby opened to the bar of limitations depends upon matter of substance. *Morris* v. *Wheat, supra.* Whether the cause of action remains the same should be the test, and the mere change from the form of action in *assumpsit* to one in tort would be immaterial. *Smith* v. *Bellows*, 77 Pa. St. 441.

3. Another contention in support of the judgment is that the release under seal executed by Laura P. Howard to the Newport News and Mississippi Valley Co. was a complete bar to the action, and of itself required an instruction to the jury to find for the defendant. The ground is that under the statute defining the separate property of married women and their right of contracting and suing in respect thereof without joining the husband (R. S. D. C., Sec. 727), the right of action in this case became the separate property of the wife, and could be discharged by her separate

act. No instruction was asked by either party in respect of this point, and it seems to have been completely ignored. It may be here remarked that even in the view of the wife's right contended for by the defendant, the husband had an independent right to recover such special damages as he may have sustained by reason of the injury to his wife. *Metropolitan Railroad Co.* v. *Snashall,* 8 App. D. C. 435. It is not necessary to consider whether this right of property in a cause of action for personal injury accruing in another State must be determined by the law of the forum, of the domicile of the injured party, or of the place of the contract and injury. There being no proof of the laws of Kentucky or Indiana as regards the property rights of married women, the presumption must be indulged either that the rule of the common law or that in force in the District of Columbia prevails in both those States. If it be the rule of the common law, clearly the wife could not release the claim for damages. If it be the rule prevailing in the District, we are constrained to adopt the same conclusion. It seems to have been the general opinion of the profession that the statute did not embrace a right of action for personal injuries, and hence it was the universal rule, so far as we can now learn, to bring such suits, after the date of the act as before, in the names of both husband and wife. The question at last came before the Supreme Court of the District, in general term, in 1890, and after full consideration it was held that such a right of action was not the separate statutory property of the wife. *Snashall* v. *Metropolitan Railroad Co.,* 19 D. C. 407, 411. The soundness of that decision seems not to have been questioned until the argument of this case. It has become a rule of property to as great an extent as is possible in respect of property of such peculiar character, and whilst not altogether satisfied with the reasoning by which the conclusion was reached, we think it proper to follow it in a case coming directly within it. What the rights of the wife might be under certain circum-

11 Ct. App.—23.

stances, as against the husband, will not now be inquired of; but may be regarded as open for consideration when a proper case may be presented.   Nor is it material to inquire whether, under the allegations of the declaration, the husband is not estopped to deny that the claim in suit is the separate property of the wife through his gift of the same to her; for if the right was not her separate property under the statute, she could not make a contract effective, at least, at law, without his joining with her.   *Rathbone* v. *Hamilton*, 4 App. D. C. 475, 485, 488.

4. The decision of these preliminary questions against the contention of the appellee brings us to the consideration of the points upon which the case was actually made to turn by the learned justice who presided at the trial and directed the verdict.

(1) We are of the opinion that the evidence of H. W. Fuller respecting the contents of the ticket was rightly admitted.   It is true that the absence of the ticket itself was not directly accounted for, but no objection was made on that ground. The witness was general passenger agent at the time the ticket was printed, and, whilst he had not seen that particular ticket, he was able to testify to its contents from his recollection of the forms of ticket then in use, all of which had been prepared under his direction.   The person who sold the unused part of the ticket to Mrs. Howard produced a memorandum entry of the sale showing that the ticket was of a printed form designated as 758c.   The witness Fuller produced a single trip ticket from Washington to Louisville, of that form, and then testified that the "round trip" tickets had the same designation, but with the additional term "ex.," signifying excursion or round trip, and that their conditions were identical in all respects save one relating exclusively to the use of the return coupon.   That condition has no bearing whatever upon the case.   In this state of the evidence it was not improper to permit the witness to refer to the single trip ticket in order to refresh his memory of the

precise words printed on the excursion ticket which, with its return coupon only, Mrs. Howard had purchased and used.

(2) The ticket upon its face declared that the defendant, in selling it, assumed no responsibility beyond its own line, and acted as agent only for connecting lines. In the absence of a special contract to the contrary, the selling carrier's duty is completely discharged by safe carriage to the end of its own line where a connecting carrier may be ready to continue the transportation on the designated route. *P. R. Co.* v. *Jones,* 155 U. S. 333, 339. And in so far as the duty of the defendant is to be controlled by the terms of the contract in this case, it remained unchanged. The original purchaser was bound by these conditions, and plaintiff, holding under him, could have no better right. Therefore, if the testimony shows that the defendant and the corporation which owned the line between Lexington and Big Sandy were engaged in the operation of their own lines respectively, without partnership or agreement for joint operation beyond that of receiving and forwarding passengers upon such tickets, with separate coupons for each line, the defendant incurred no liability to the plaintiff, and the instruction to the jury would have to be sustained. *P. R. Co.* v. *Jones,* 155 U. S. 333.

(3) From that testimony, given exclusively by defendant's witnesses and set out in full in the preliminary statement, it appears that the road upon which the accident occurred had been built by the Elizabethtown, Lexington and Big Sandy Railroad Company under a charter from the State of Kentucky, and is wholly within that State. That charter authorized it to make contracts with other corporations for the operation of its railway. The Chesapeake and Ohio Railway Company, under charter from the State of Virginia, built and operated a railway from Newport News to Huntington and Big Sandy, connecting with the line of the Elizabethtown, Lexington and Big Sandy Railway Company. Collis P. Hunt-

ington, who was the principal stockholder and the control-
ling spirit of each corporation, conceived a plan to bring
under one management the foregoing railway lines and
others into one great line of transportation from the Atlantic
to the Pacific. Beginning in 1882, trains were run over the
two lines aforesaid by the name of the Chesapeake & Ohio
route, "under an arrangement by which it was practically a
continuous system." "The properties were then operated
together by one general manager, Mr. C. W. Smith, under
the verbal directions of Mr. C. P. Huntington." The terms
of this "arrangement" are not given; but it appears that
the defendant's officers maintained the railway of the Ken-
tucky corporation and kept an account of all receipts and
disbursements on account of the latter. From the terms of
the "arrangement" as stated, and the nature of the pro-
ceedings thereunder, we think it clear that the defendant
became responsible for the safe carriage of passengers over
the railway of the Kentucky corporation. *P. R. Co.* v.
*Jones,* 155 U. S. 333; *Sun Ins. Co.* v. *Kountz Line,* 122 U. S.
583. The condition of a contract, therefore, confining de-
fendant's liability to its own line must necessarily be limited
in its operation to such other connecting lines only as may
have remained under their own separate and independent
management. This "arrangement" or contract for the
operation of one line by the other was to extend to the latter
part of the year 1887, or about one year later than the date
of the injury to Mrs. Howard. It follows, therefore, that if
nothing had occurred in the meantime to change the
arrangement aforesaid, the condition of the ticket would
not prevent recovery in this action if the injuries received
by Mrs. Howard were caused by the carrier's negligence.

(4) The chief point of defendant's contention is that the
arrangement had come to an end prior to the accident, in
so far as defendant was concerned, by the lease of its line
to the Newport News and Mississippi Valley Company.
The evidence in support of this contention shows that in

January and June, 1886, respectively, the defendant and the Elizabethtown, Lexington and Big Sandy Railway Company had entered into contracts with the Newport News and Mississippi Valley Company for the lease of their lines for 250 years, upon an annual rental of $5,000. Collis P. Huntington signed the defendant's lease for each company as president. Though not president of the Kentucky corporation, he controlled it absolutely. This was all done in execution of his plan for a great Atlantic and Pacific railway system. Referring to the arrangement aforesaid, under which the defendant operated the two lines of railway, the witness said: "The organization of the Newport News and Mississippi Valley Company terminated the contract, I suppose, by force of the arrangement then made. It was terminated in the same manner it was made by direction of Mr. Huntington; Mr. Huntington directed Mr. Smith to operate the properties, as I have indicated, and upon the formation of the Newport News and Mississippi Valley Company and the execution of the leases, he directed the operation of the line to be had in accordance with these leases." This general lessee corporation was incorporated by the Legislature of the State of Connecticut, March 27, 1884, under the name of the Southern Pacific Company, which was changed by an amendatory act, March 10, 1885, to that of the Newport News and Mississippi Valley Company. This act of incorporation is not set out in the record, and it does not appear what express powers it was authorized to exercise outside the limits of that State. One clause is given, however, which expressly forbids the power to "make joint stock with, own, hold or operate any railroad in the State of Connecticut."

Virtually banished from the State of its creation, this corporation came to the State of Virginia, and apparently without permission of the legislature of that State, leased and undertook to operate the railway and exercise the franchises of the defendant. It is unnecessary to cite authorities to the

point that the defendant, a *quasi*-public corporation of the State of Virginia could not, without the express consent of that commonwealth, escape the performance of its duties and obligations · by a voluntary surrender of its road to a so-called lessee. Whilst the lessee might become liable for an injury done in the operation of the railway, the lessor would not be exempt by reason of its retirement therefrom. Two things must concur to give full legal operation to a lease by one such corporation to another, namely, the permission of the State through power expressly conferred upon each. *St. Louis, etc., R. Co.* v. *T. H. & I. R. Co.*, 145 U. S. 393, 402. There is nothing in the record to show that the State of Virginia ever authorized the lease by defendant of its railway. Nor does it appear that the existence of the New-port News and Mississippi Valley Company had ever been recognized by that State, or the State of Kentucky, much less the power conferred upon it to lease and operate a railway therein. If it had been proved that the defendant had the general power to lease its road that seems to have been conferred upon the Elizabethtown, Lexington and Big Sandy Railway Company, and that the Newport News and Mississippi Valley Company had the general power under its charter to lease and operate railways anywhere outside of the limits · of Connecticut, we could not regard this lease as exempting the defendant from liability. Notwithstanding the independent existence of our States, their mutual relations and interests and the general welfare of the Union demand that in respect of the recognition of the legislative and judicial acts of one by the others, the widest and most liberal principles of comity should prevail. There is no proper room for the exercise of a selfish or jealous spirit. But the limit is reached when one seeks to act in respect of matters peculiarly within the power of another, or in opposition to its fixed policy. Consequently, by operation of the spirit of comity, the *bona fide* corporations of one State have been permitted to enter the others, to maintain offices, to

transact business and to maintain their rights in the courts where their business and objects have not been immoral or opposed to sound and well-defined public policy. But comity has never been stretched so far by any State as to permit the corporation of another State to exercise an extraordinary power or franchise within its boundaries, without its own express grant. And for the same reason, the courts of a State will not recognize a contract by which a foreign corporation, without express sanction of their own legislature, takes upon itself the performance of duties and powers of a public nature which have been conferred upon corporations created by the State itself for those purposes. Moreover, there is another well founded limitation upon the exercise of comity in such cases. A foreign corporation should not be recognized or tolerated in the exercise of extraordinary powers or in carrying on business that are expressly forbidden it in the State of its creation. This general doctrine has been enounced in a well considered case by the Supreme Court of Kansas that commands our approval. *Land Grant Ry. & T. Co.* v. *Board Coms. Coffee Co.*, 6 Kans. 245; see also 6 Thomp. Corp., Sec. 7896; 2 Morawetz Corp., Sec. 965a; Wharton, Confl. Laws, Sec. 390b. Though not fully stated in the record, the charter of the lessee company shows enough to bring it within exception to the rule of comity above stated. Discredited by its own creating legislature, specially forbidden the exercise of these very powers in its own State, and practically expelled therefrom, are other States, in the language of the Supreme Court of Kansas, "bound by any kind of courtesy or comity, or friendship or kindness, to treat this corporation better than its own creator has done?" We think not. Had this corporation been recognized in the exercise of these powers by the Court of Appeals of Virginia, we would feel bound to follow its decision and give effect to the lease within the limits of that State; but in the absence of such a decision we will give effect to our own opinion. That the proba-

bility of such a decision by the courts of the States directly interested was apprehended by the controller of these corporations, is apparent from the evidence of the witness heretofore freely quoted from, who had been the general solicitor in Virginia for both the lessor and lessee.   He says: "The Newport News and Mississippi Valley Company had organized and taken a number of leases from the foregoing companies when a question arose as to the provisions of the original act, which provided that the Newport News and Mississippi Valley Company should not have the power ' to make joint stock with, own, hold or operate any railroad in the State of Connecticut.'   The amendment of April 27, 1887, added these words: ' Unless such railroad shall be held, owned or operated within said State in conformity with the provisions of the general laws of the State.' "   It is not necessary to consider the effect of this amendment, because it took effect long after the accrual of plaintiff's cause of action.   The same apprehension, we may add, seems to have inspired the terms of the release obtained from Mrs. Howard, which discharged not only the said lessee by name, but also its "lessors or predecessor companies."

5. Having occupied so much space with a statement of the evidence upon which the case was submitted in order that it might be fully and fairly presented, and having dwelt at some length upon the questions that required consideration and decision, we will pretermit, as unimportant as well as unnecessary, in view of the foregoing conclusions, the consideration of the general question of liability irrespective of the invalidity of the lease.

Being of the opinion, for the reasons above given, that it was error to direct a verdict for the defendant, the judgment will be reversed, with costs to the appellants, and the cause remanded with direction to set aside the verdict and grant a new trial.   It is so ordered.

*Reversed and remanded.*